691 A.2d 350

ROXANNE GENNARI, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTEHARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND ELLEN RUMBERT, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

WEICHERT CO. REALTORS, THIRD PARTY–PLAINTIFF, v. J.E.M. HEATING AND COOLING, INC. AND RICK INGS, THIRD PARTY–DEFENDANTS. (FOUR CASES) JAMES NESTOR AND JOAN NESTOR, PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND

ALLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTEHARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

RAJAN S. MATHEWS AND GRACE MATHEWS, PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTEHARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

RAYMOND LACHAPELLE AND JANET LACHAPELLE, PLAINTIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. WEICHERT CO. REALTORS, INDIVIDUALLY AND AS AGENT OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT, AND TIMBERLINE PROPERTY DEVELOPMENT, INC., A CORPORATION OF THE STATE OF NEW JERSEY AND ALLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., AND WEICHERT REALTORS, AND VAN NOTEHARVEY ASSOCIATES AND J.E.M. HEATING AND COOLING, DEFENDANTS, AND ELLEN RUMBERG, INDIVIDUALLY AND AS PRINCIPAL, AGENT OR EMPLOYEE OF TIMBERLINE PROPERTY DEVELOPMENT, INC., DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued December 2, 1996—Decided April 15, 1997.

584

*Martin Newmark* argued the cause for appellant and cross-respondent Weichert Co. Realtors (*Broderick, Newmark & Grather*, attorneys; *Mr. Newmark* and *Alan J. Baldwin*, on the briefs).

*Frances J. Panzini–Romeo* argued the cause for appellant and cross-respondent Ellen Rumberg (*O'Donnell, Kennedy, Vespole, Piechta & Trifiolis*, attorneys).

*George Dougherty* argued the cause for respondents and cross-appellants (*Katz & Dougherty*, attorneys).

*Arthur M. Greenbaum* submitted a brief on behalf of amicus curiae New Jersey Association of Realtors (*Greenbaum, Rowe, Smith, Ravin & Davis*, attorneys; *Mr. Greenbaum* and *Bruce D. Greenberg*, on the brief).

*Cindy K. Miller*, Senior Deputy Attorney General, submitted a brief on behalf of amicus curiae Attorney General of New Jersey (*Peter G. Verniero*, Attorney General, attorney; *Jeffrey C. Burstein*, Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue is whether defendant, Weichert Co. Realtors ("Weichert"), as the sales agent of a residential real estate devel-

oper, is liable under the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to – 20 (the "Act"), for affirmative misrepresentations to purchasers of new homes from the developer. After a trial on liability only, the Law Division found Weichert liable as the sole proximate cause of the purchaser's losses. In affirming the imposition of liability on Weichert, the Appellate Division also imposed liability on the builder, Allen Rumberg, and his wife, Ellen, under the Act and for common-law fraud. Finally, the court held that the Rumbergs were subject to punitive damages. We granted motions for leave to appeal by Weichert, Ellen, and the purchasers. We modify and affirm the judgment of the Appellate Division.

## I.

Plaintiffs Roxanne Gennari, James and Joan Nestor, Rajan and Grace Mathews, and Raymond and Janet LaChapelle are purchasers of homes in a thirty-five house development in Lawrence Township known as Squire's Runne. Timberline Property Development ("Timberline"), a corporation owned by Allen and Ellen Rumberg, built the houses, which suffered from substantial defects. Timberline is now bankrupt. Underlying this case are Weichert's misrepresentations about Allen's qualifications as a builder and the construction of the defective homes. This appeal arises from the trial of a consolidated action involving claims asserted by the purchasers against Weichert, Timberline, the Rumbergs and others.

Weichert is a real estate broker with offices throughout the United States. Ellen Rumberg was a sales associate in Weichert's East Brunswick office and the Weichert sales representative at Squire's Runne. Weichert maintained a trailer and signs at the development. Joining Ellen Rumberg at the site was Weichert agent Ruth Skonieczny, now deceased. Another Weichert agent, Nancy Healey, also was active in selling homes at Squire's Runne. In Weichert's East Brunswick office, the manager, Thomas Glick, approved marketing strategy and advertisements for the development.

In a liability trial that extended for thirty-four days over eight months, the Law Division heard testimony about Weichert's representations to purchasers and the defects in the homes. Perhaps because the trial was so protracted, the Law Division did not make detailed factual findings on all issues. The Appellate Division, however, filled in many missing details. To avoid unnecessary duplication, we draw on the factual findings of both courts.

The most direct link between Weichert, Allen Rumberg, and Timberline is Ellen Rumberg, Allen's wife and a Weichert agent. Ellen's dual role on behalf of the builder and the realtor is at the crux of this case. As a Weichert agent, Ellen had been the listing broker for Allen's initial building effort, a four-lot development in Holmdel, New Jersey. With Ellen's help, Allen and Thomas Glick negotiated the listing agreement for the Holmdel property. At Holmdel, as at Squire's Runne, Weichert paid for all advertising, brochures, newspaper advertising, and communications with other brokers. Foreshadowing the problems at Squire's Runne, the Holmdel houses suffered from numerous defects: shoddy workmanship, inadequate heating systems, roof problems, uninsulated pipes, improper foundation waterproofing, uneven floors, inadequate air conditioning systems, and delayed completion.

At Squire's Runne, Allen again negotiated with Glick for a listing agreement concerning the advertising and marketing of the houses. Weichert agreed to provide a sales trailer at the site and to pay for advertising, telephone costs, and a sales brochure. Robert Albrecht, a Weichert regional vice-president, and Paul Christman, a senior vice-president, approved the arrangement for Weichert. The trial court concluded:

> Here, high Weichert management made a determination to spend considerable funds that would boldly display its name in the signage at the construction site, in advertising, in brochures, and in the presence of its sales agents. Weichert was proclaiming the excellence of the project.

In brief, Weichert was intimately involved with Allen Rumberg in the sale of houses to the purchasers at Squire's Runne. Weichert, however, did not verify the information provided by Allen. Nor did Weichert establish a procedure to confirm its agent's

representations to prospective purchasers. Weichert, moreover, was the means through which the purchasers learned about Allen. Weichert's representations led the purchasers to believe that Weichert agents were familiar with Allen and his workmanship.

The Law Division characterized the trust that the purchasers placed in Weichert's representations by referring to the purchasers' "belief[s] through the activities of Weichert that their homes would be of high quality.... In essence, they were led to believe that Rumberg was an exacting and demanding builder of real substance. They were misled."

The Law Division also found:

> Plaintiffs purchased at Squire's Runne because of the focused and highly specific misrepresentations made by Weichert agents, and in part, by the equally misleading literature as to the quality of construction. Weichert is the reason plaintiffs signed on with Allen Rumberg.

In the sale of the houses, Ellen Rumberg, Ruth Skonieczny, and Nancy Healey represented that Allen was an experienced builder who had built hundreds of quality homes throughout New Jersey. The facts were to the contrary. Generally speaking, he had always worked under the supervision of others, primarily his brother-in-law, Philip Kayne. His workmanship, moreover, was disastrous.

In meticulous detail, the Appellate Division expanded on the Law Division's more general fact-findings concerning defective construction and Weichert's role in the sale of the houses:

> Roxanne Gennari was the first of the four plaintiffs to contract for a new home in Squire's Runne. Gennari, a full-time real estate agent, was active in Mercer County since 1980. In April 1986, Nancy Healey, Gennari's neighbor and a Weichert agent, told her about a new development Weichert was marketing. Although Gennari was not looking for a new home, she was impressed with Healey's description of both the builder and the development because Healey was someone whose opinion Gennari respected. She and Healey were business partners, and had purchased a lot in a Windsor Township development on which they intended to have a house built and then to sell it.
>
> Healey told Gennari that Squire's Runne was to be constructed by a North Jersey builder who had built hundreds of homes and was a person of detail and craftsmanship. If they acted quickly, they could get in at preconstruction prices. In Healey's opinion, this represented a wonderful investment. Gennari was

interested and excited not only because of her friend's opinion but because she knew Weichert was a large and reputable firm and was behind the development. At the site, Gennari first met Ellen Rumberg. She confirmed that her husband had built hundreds of homes, demanded excellent quality, and that he built homes in Mendham. She said he has five engineering degrees and that he was "timely."

Prior to Gennari's May 14, 1986 contract signing, Healey invited her to attend a meeting at Weichert's Princeton office with the builder. At that meeting, Rumberg claimed he had a father and son team who would be working on this project and who had been working with him for years, and that he was so particular only one man in the whole State could do Rumberg's stucco work. He produced a portfolio with a number of photos of homes. Healey told Gennari that Rumberg built the homes. She reiterated that Rumberg had built hundreds of homes and had recently finished a development in Mendham.

After the meeting, Gennari asked Healey to go to look at the homes that Rumberg had built in Mendham. Healey did, and reported back that the homes were more beautiful than the photographs; the development was gorgeous, the detail exquisite, and the craftsmanship excellent. Gennari expressed concern about the closing date to Healey and the Rumbergs. She asked to close in January, 1987. Ellen Rumberg asserted that her husband always closed on time. Gennari, therefore, signed her contract on May 14, 1986.

Healey testified that the only things she told Gennari about the development were that they could purchase early at a reduced price and that it was going to be located on a beautiful piece of property. She denied ever describing Rumberg as the best builder from North Jersey and denied that she ever told Gennari that Rumberg had built hundreds of homes. She also denied going to Mendham after the meeting with Gennari and Rumberg and reporting back to Gennari as to what she had seen. Healey and her husband, though, had driven to Mendham before Gennari's meeting with Rumberg. They spoke to a resident in the development who was happy with the builder and his home.

Gennari made color and option selections with Ellen Rumberg. The process was finished by early fall, but nothing was happening on the site despite the January 2, 1987 closing date. Ellen Rumberg told her not·to worry, and blamed the delay on the township which did not give final subdivision approval until the end of October. Rumberg received the building permit for the Gennari lot on November 17, 1986.

Gennari was not able to inspect her home while it was being constructed. There was no road to the homesite and no easy way for her to get there. Rumberg told her that one of his rules was that purchasers were not welcome to go to the homes. She would have to have his specific permission to visit the property during construction. Rumberg posted a security guard to prevent access to the homes. On one occasion, Gennari slipped by the guard, got into the house, and complained about some deficiencies. Rumberg became angry, ordered her to stay away from the home and indicated he would fire the guard. Gennari noticed two obvious problems with the house. The back stairs were constructed so that they jutted into one of the bays of the two-car garage, effectively rendering it a one-car garage and the brick being put on the front of her home was the wrong color. The

staircase was removed when Rumberg maintained that there was no other way to construct it. Rumberg also corrected the mistake with the brick.

The Gennari closing was delayed until January, 1988. The only walk-through of the house permitted occurred on the day of the closing. Gennari noticed many problems. She observed drainage problems and a large hump on the front lawn. She had seen these months earlier and was assured by Ellen Rumberg, that they were just grading problems. There were gaps and buckling in the siding; bent wood in the trim; the roofing was discolored and not what she had chosen; and there were cracks in the foundation. The garage and basement floors were badly cracked, the basement walls had several large cracks, a kitchen wall was bowed, and the hardwood floors had gaps throughout. The most serious problem was with the heating system. Upstairs was extremely hot, while downstairs the heat was inadequate. She was told that the heat problem was simply a matter of adjustment. Someone allegedly had brushed up against the thermostat which caused the excessive heat upstairs. She was told that the mound on the front yard was there because the township ordered that type of grading and there was nothing they could do about it. She later found out that the mound was associated with the aerobic wastewater disposal system that was required in place of a normal septic system.

Despite the problems, Gennari went to closing because the people who bought her old home wanted her to leave, and Rumberg threatened to sue her if she did not close on time. Furthermore, she feared loss of the nearly $100,000 she had already deposited. She was assured by the Weichert representatives at the sales trailer that everything would be taken care of.

Once she moved in, however, the heating system was not working properly and the septic system overflowed onto the front lawn, backed up into the basement, and caused a terrible smell in the bathrooms. Twice she had ankle deep water in the basement from septic system overflow. The installer of the system explained that normally there is an overflow alarm on the system, but it had not been hooked up. Further, although she was told the system would have a 1500–gallon capacity, it was downsized to hold only 500 gallons. This was inadequate as six people were living in the house, using about eight hundred gallons of water a day. The system repeatedly overflowed even to the time of trial. As to the heating system, the ductwork had fallen into the basement several times because it was not secured properly. Although it was a two-zone system, the system was not constructed so that the zones were entirely separate and both systems were feeding off only one return.

Gennari also complained that the windows were inferior and leaked air and water. She had chosen Andersen Windows, but had been given the Ideal brand instead. Her hardwood floors were still a problem at the time of trial. Each time Rumberg sent people over to fix them, they made the situation worse. They were still buckling and not level, had large gaps and were poorly finished. The exterior of the property was never properly graded causing pooling of water which flooded her basement and her front walkway.

Grace and Rajan Mathews, other disgruntled buyers, found Squire's Runne through a builder-friend who suggested that they get in touch with Ruth Skoniec-

zny, a Weichert agent. Grace was familiar with Weichert as one of the biggest real estate companies in New Jersey. She associated the Weichert name with very good quality homes. She met with Skonieczny, who gave her a brochure and promotional material. Grace was impressed with the fact that these were going to be custom built homes with flexibility in design, that nationally known brand name materials were being offered in the houses and that such a large realtor with name recognition was making the offering.

Within the first two weeks of May 1986, the Mathews met with Skonieczny at the site and first asked who the builder was. They were told that Rumberg had built hundreds of homes, and that she herself had worked with him very closely at a development in Holmdel, along with Rumberg's wife, Ellen. She claimed Rumberg was an excellent builder with great credentials and was known for quality workmanship, performed by crews who had worked with, and for him, in the past. She asserted that Rumberg was devoted to detail and actively supervised the building of the homes. The Mathews were presented with a portfolio of impressive homes which Rumberg had built.

They discussed the completion of the home, as the Mathews were expecting their first child in the early part of September. They specifically asked Skonieczny what her experience had been with Rumberg as to timely closings. She represented that Rumberg needed three to four months to complete a home and was very good about meeting deadlines and was always within two weeks of the scheduled closing date.

The Mathews met with Rumberg himself before signing the contract. He said he had built hundreds of homes and had qualifications, experience and expertise necessary and he took care in building homes, using quality craftsmen and crews brought with him from other developments. He maintained that he spent much time supervising his projects and introduced them to his supervisor. When the Mathews raised the timing issue, Rumberg confirmed that closing would be three to four months from the time they signed the contract.

They signed the contract on June 17, 1986, with a closing date of December 30, 1986, or four months from the issuance of a mortgage commitment, for the base price of $360,000. The Mathews did no checking on their own to verify the representations made about Rumberg's experience or qualifications. Skonieczny showed them newspaper articles about the development to support her claims. The articles also referred to the builder's commitment to quality, use of top-grade construction materials and quality workmen, and his framing of homes in douglas fir.

In August, though, when they had noticed nothing had been done on their lot, they checked with Skonieczny who said Rumberg had run into problems with the township and that the building process would take an additional month and a half. They listed their home for sale with Weichert through Skonieczny. She sold their house with a closing date in February, 1987. She assured the Mathews, however, that they would be in the Squire's Runne home in early February. That date came and went as did several others in early 1987. As with Gennari, Rumberg promised month by month a closing date, and each month the date got pushed back. The buyers of their home were cooperative, however, and agreed to the extension until

April, when they gave the Mathews a deadline to the end of May. At the end of May, the Squire's Runne home was still not ready. The Mathews first moved in with friends and rented a townhouse in Princeton Junction on a monthly basis. They finally closed on September 26, 1987.

Up to the date of closing, the Mathews were not allowed to visit their homesite, as Rumberg said they could not go in without his permission. Rumberg posted a guard and the Mathews never tried to get by him to see their home. Their first inspection was on the date of the closing and resulted in a four-page list of items which the Mathews found incomplete or not done properly. Rumberg, though, said the repairs could all be completed within thirty days and the Mathews went through with the closing.

After living in the house for four or five days, upon finishing a load of wash, they saw foam all over the front yard. Rumberg responded they were using the wrong detergent. Over the next several days, the windows started collapsing. Fog was appearing between the panes and the windows began leaking air as the weather got colder. They thought these were Hurd windows, which had a high quality reputation, but Rumberg told them that they got Ideal windows instead. At first, the leakage was only from air, but after a very heavy rain, three of the windows were also leaking water under the sills.

As time went on, the Mathews noticed other serious problems. Their bathroom pipes went through the garage area. They froze because there was no insulation even though they had paid for an upgraded insulation package. There was a severe water problem in the basement. The basement walls were wet and water came in from beneath a concrete slab which was part of the entry way into the house. The walls in the entry way and around the stairway were bowed and misaligned, and there was a slope in the entry foyer floor. Doors were misaligned and could not be secured because the bolt did not meet the hole on the doorframe. The hardwood floors also had defects. The septic system continued to overflow even though they changed detergents and it made a gurgling noise that could be heard throughout the front of the house, as a silencer had not been installed. There was also a problem with the timing of the pumps. Four pumps failed within a year and a half, some of which occurred when the system's one year warranty expired and for which the Mathews had to pay.

Furthermore, the heat distribution was uneven and the bedroom over the garage was extremely cold, as was the adjoining bathroom. Only once, after the Mathews repeatedly complained to Rumberg, did Rumberg send someone over to look at the heating system. That person looked at the ductwork and never came back. A portion of their roof bowed, but Rumberg claimed it was a result of normal settling.

In June 1986, Joan and James Nestor saw an advertisement for Squire's Runne. Because of its location and because it was offered by Weichert Realtors, it immediately interested them. Joan went to the site alone, meeting first with Ellen Rumberg who introduced herself as a sales representative of Weichert. She informed Joan that she was the builder's wife and would be involved in the building process. She stated that her husband had an engineering degree, had over ten years of building experience, had built over a hundred homes and had used a crew

that had been with him for years. He was a man who paid extreme attention to detail. Ellen stated that Weichert supported her husband one hundred percent.

On June 10, 1986, the Nestors and the Rumbergs met at the site. Nestor noticed a large sign advertising Squire's Runne with a logo and only Weichert's name on it. The brochure Mrs. Nestor was given had only Weichert's name on it. Rumberg talked about the wonderful Hurd windows he used in the development and Ellen brought out other samples of materials Rumberg used in these homes, including Revere siding. Rumberg told them that he was a quality builder, had built over one hundred homes, had more than ten years of experience as a builder, used an experienced crew of workmen who had been with him for years, and that he hired the finest workers. He told them he had four degrees, but was most proud of his engineering degree. Ellen added that her husband's customers loved him and some of them still called the office about him. . . . The Nestors recalled how the Rumbergs kept repeating that Allen used experienced workers and good quality materials.

On June 14, 1986, the Nestors went to an address in Mendham given to them by Ellen Rumberg, as a home her husband had built. The homeowner told them that she had been in the house only two weeks and was its second owner, so she did not know the builder. She gave them a tour of the house which the Nestors found to be absolutely beautiful. They were convinced that a top builder built that home. The only problem they saw were some gaps in the hardwood flooring.

They immediately scheduled another appointment with the Rumbergs to talk about building their home and on June 19, 1986, they chose a lot. They were initially interested in lot number three but Rumberg persuaded them to choose lot twenty-four instead because it had "perked" beautifully. Rumberg asserted that he had never built a home that had a water problem, but he had some concerns in that regard with lot three. They took lot twenty-four because Rumberg claimed they would never have a water problem there. Ellen said the closing would be January 15, 1987, as her husband built homes in four months. She also stated that the January date was firm. At that meeting, Joan Nestor mentioned the unsightly gaps in the hardwood floor that she had seen in the Mendham house. Allen Rumberg told her that it occurred because those people had chosen a lower grade of wood and he would not allow that to happen at Squire's Runne.

They signed the contract of sale on July 15, 1986, with a closing date of January 15, 1987. The Nestors were given a choice between Andersen and Hurd windows and initially indicated a preference for Andersen. However, Allen Rumberg gave a lengthy presentation using a Hurd window sample. The Nestors then chose Hurd windows, and Ellen Rumberg checked the space next to Hurd windows on the selection sheet. Rumberg asserted that Douglas fir was the premier lumber in construction and that it would be used in their house.

By October 1986 nothing was happening at the site and so the Nestors stopped at the trailer and met Ruth Skonieczny. She introduced herself as a Weichert sales agent. They asked what was going on. She told them that they had to trust the builder, and that Lawrence Township was delaying Rumberg. The January closing date, however, passed without explanation. Rumberg assured them in late January that they would be in their house by March. In March, the framing on

the house was only half done, but in May, the Nestors received a notice that another installment payment was due because the roof and windows were in place. They attempted to visit the site on several occasions but a guard was posted who said no one was allowed on the site. They were able to view the home only from a distance, and nothing appeared unsatisfactory from their distant vantage point.

In July 1987, Joan Nestor went to the site to meet with the mason about a fireplace. She found the siding color was yellow. They had, however, chosen a tan which they had coordinated with the roof and shutters. At that point though, at least seventy-five percent of the siding was on. The Nestors themselves were in a time bind because there was a contract of sale on their own home, and, therefore, they decided to keep the wrong color siding.

The Nestors needed to close in September because they had a mid-October closing date on their old house. Their written request to Rumberg received no response. In early October, James Nestor met with Rumberg and told him that they had to close by October 19, or he would be forced to rent with a minimum three-month lease which would postpone the closing for three months. On October 7, the Nestors were allowed a walk through of the home, accompanied by their privately retained home inspector, in preparation for an October 10, 1987 closing. There were dozens of workers in the house.

The inspector pointed out there was no heat flowing in the rooms over the garage and water was pooling on the western side of the house. Other less serious problems involved fixtures which had not yet been installed and items which were not completely assembled. There was so much disorder in the house that they could not make a thorough inspection. Rumberg told the Nestors that the heating difficulty was a balancing problem and nothing to worry about. Similarly, he stated the water pooling on the western side of the house was a simple regrading problem. Nestor accepted those explanations.

The Nestors went back to the site and walked through the house by themselves on October 9. Several problems had been corrected but, for the first time, they were able to see the floors and were shocked because they were discolored and stained. They told Rumberg that they were not going to close with the floors in that condition. Rumberg assured them that he would take care of the floors and agreed to house the Nestor family in the Hyatt Hotel while the floors were redone after closing. Under those conditions the Nestors closed on October 10.

The Nestors moved into the house on October 21, 1987. The basement on the west side of the house was wet. There was a long list of other problems which required workmen to come to the house, but repairs progressed at a slow pace. The Nestors felt cold winds from gaps in the drywall, the heating was uneven and, like the rooms over the garage, the main bath and the master bath were particularly cold. The family room, which had a cathedral ceiling, was also much cooler than the kitchen which was next to it, causing drafts. Workmen spent two hours on one occasion working on the system, but after they left, the Nestors noticed no improvement. Further, there was no insulation in the rooms abutting the garage. Rumberg sent workers to install insulation, but they installed it backwards. The second-floor bedroom was heated only when the first floor heater

was on in the two-zone system, and only the rooms at the very center of the house got reasonable heat.

In January 1988, James Nestor again saw a pool of water sitting against the western side of his house. He went into the basement and saw water pouring through the basement windows onto the floor. He called and Rumberg and his superintendent came to the house within minutes. The two of them ran back and forth from basement window to basement window with Rumberg shouting: "[W]hat are we going to do, what are we going to do." Nestor also showed them cracks in some of the basement girders, but both told him it was nothing to worry about. Nestor also showed them several lolly columns that were not supporting girders, but was told they would just put shims there. However, no one ever came to do the work. Nestor took the men upstairs and showed them the windows. The corners did not meet the frame and air was leaking in. Rumberg told him that the windows were Ideal windows. Nestor protested, saying that they had selected Hurd windows but Rumberg maintained that they had not. A representative from the window distributor came to look at the windows. He maintained that the gaps were normal. To correct the problem, the representative stuck black weather stripping into the gaps claiming that was all that could be done.

The Nestors were told they were going to have a standard septic system. Instead an aerobic wastewater treatment system was installed which subsequently overflowed onto their front lawn. The Nestors had to be careful about the volume of water that passed through the system, as well as the soaps and paper they used.

The LaChapelles were attracted to Squire's Runne by Weichert's ads. Janet LaChapelle had worked full time as a real estate agent in Princeton Junction between 1974 and 1975, but was inactive in the real estate business at the time she saw the development. She had known of the Weichert name, though, for many years. It was an established company and she knew if Weichert had a listing, you could rely on the information on the listing sheet. On July 13, 1987, she and her husband went to the site and spoke to Ellen Rumberg who said her husband was the builder, and that he had built homes in Mendham, Holmdel and Livingston. In response to Janet's question, Ellen said that her husband had been in business over ten years and had built hundreds of homes. He had a crew and a "super" who had been with him for years. He paid more than the normal rate to his super, as well as a $1000–$1500 per home bonus to get construction done on time.

Before the LaChapelles signed a contract, Janet took a ride to Holmdel to see the homes that Rumberg built there. She went to the same model home that she was interested in, but no one was home. She spoke with a landscaper who indicated that he had heard the homeowners were unhappy about a banister, but he really did not know what the situation was. The LaChapelles then went to Mendham and talked to a homeowner who was outside of the house. He was the second owner of the home and had no idea who the builder was. They went to another house and found a homeowner who showed them around the house. She loved the house but did not recognize the name Rumberg. She said the name of the person she had worked with was Phil. The next day, the LaChapelles told Ellen about the conversation and asked who Phil was. Ellen said that Phil was the superintendent on that job and was Allen's brother-in-law.

The LaChapelles signed their contract on July 19, 1986, and had a closing date of March 1, 1987. Although the Rumbergs attempted to persuade Janet that Hurd windows were better than Andersen, she chose Andersen. The LaChapelles also could only watch their home being built from a distance. They were told they could not go near the home. In the spring, Allen Rumberg told the LaChapelles that their home would be ready "soon." In response, they put their house on the market in May and sold it within four to six weeks. Janet then told the Rumbergs she had a buyer and needed a closing date. Allen said their new home would be ready in August. She then agreed to a closing date of October 14, 1987 for her house. In October, the Squire's Runne home looked as if it was ready, but the LaChapelles could not get in. They and their three children were forced to move into a two-bedroom, one-bath condo. Rumberg promised them that they would be in by Thanksgiving and then promised closing by Christmas. Because they would have lost their mortgage if they did not close by December 30, 1987, they closed that day.

On the day of closing, the house was littered and a man was sweeping things up. He kept telling them to get out of the house. They were disgusted and talked about whether they would go through with the closing. However, if they did not, they would have lost their mortgage commitment as well as the $100,000 in deposit money they had already given Rumberg.

They moved in the following day. When they walked into the house after the closing, it was cold. · They found this odd since the day before they noticed how hot it was. They called the superintendent to take care of it. Someone had turned the emergency switches off because there was a short in the thermostat and the heat would not turn off by itself. During the night they heard a loud bang from the basement. They went downstairs and saw that a heating system duct had fallen to the floor. After the ductwork was repaired, they found they had very little heat on the second floor and that there were "dummy" registers.

Almost immediately, there were also problems with the windows. They were drafty and permanently fogged between the double panes. They discovered that they did not have the insulation they paid for. The LaChapelles had a problem with their siding as well. There were no window and edge finishing pieces, and consequently, hornets, bees and other insects built nests between the siding and the wood frame. The hardwood floors also had defects requiring that, in February 1988, they move out of the house while the floors were redone.

The plaintiffs hired a number of experts to inspect their homes. Mark Ma-Grann, president of an energy and building consulting firm, did a thermographic survey of the Nestor, Gennari and Mathews residences to determine the energy · efficiency and insulation quality of their homes. In all three homes he found that the insulation was poorly done; on a scale of one to ten, he rated the insulation work as, at most, a two or three. There was so much outside air infiltration that the interior walls and ceilings were cold in the winter. He stated some infiltration is normal and will show up in some spots on exterior walls, but flaws in these homes were so extensive that cold air was penetrating between the gaps in the floors and cooling ceilings as well as interior partitions and soffits. There were places along the walls where there was no insulation.

An expert was also hired by plaintiffs, Nestor, Gennari and Mathews, to inspect their HVAC systems. The two-zone systems in these homes were designed so that both furnaces were connected to a common return, seriously diminishing their efficiency. Their expert had never seen a two-zone system intentionally designed so that the cold air returns were combined. The duct work was undersized, so that some rooms had no air flow at all and other rooms receiving only minimal airflow. The ductwork was not properly supported. The standards require that the lateral ductwork be supported every five to seven feet, depending upon the size of the ductwork, whereas in these homes the ducts would go fifteen to twenty feet without any supports. This caused them to droop, and over time, to fall apart. In some areas, ducts were not even connected to the trunk lines. Two bathrooms had no warm air because the ductwork ran through an unheated garage without insulation.

A licensed professional structural engineer then inspected the plaintiffs' three homes. He found the construction demonstrated a lack of skill on the part of the tradesmen carrying out the framing. The inaccuracy of the cutting, the failure to check floor levels as they went along, the missing or misplaced piers, all showed a lack of attention to the blueprints or an inability to read them. This, he opined, was a case of second or third-class workmanship exacerbated by the use of poor quality materials. Green lumber and lumber of lower species was substituted for that called for by the architect in the drawings and no evidence of any grade stamp indicating kiln-dried lumber was found as called for.

The framer used support beams smaller in size and fewer in number than those called for in the blueprints. Failure to use sufficient supporting beams in the trusses and in the main supporting beam caused undue stress on the attic rafters which, under full snow loads, would become overloaded and would sag. In the Mathews home, a support post that was supposed to go from the roof framing of the family room to the basement was missing, causing the family room roof to sag. The floors in these homes were uneven because support beams were missing. A support beam which was to be reenforced with steel was omitted in all of these homes. Sloping floors were caused by the failure of the framer to provide double supports as called for. In the Gennari house, the failure to double every third joist resulted in furniture visibly leaning at an angle and caused the ceiling in the living room to sag.

In the Nestor home, the framer set the main girder more than an inch too low relative to the exterior walls resulting in a noticeable slope in the floors. Any attempt to raise the girder to its proper level would cause cracking throughout the house and would affect the duct work and plumbing. In the Gennari house, a masonry pier supporting a main girder was too short. To make up the difference, mortar was placed between the girder and the pier with no moisture shield to separate the two. Moisture wicking out of the masonry eventually will cause the wood to rot.

A licensed architect and expert in wood frame construction inspected all four plaintiffs' homes and also found the framing to be poor. He further observed that there was no asphalt coating on the foundation walls below grade, allowing moisture to seep in through the block walls in the basement.

Richard Ings was the framer in the development. He was used by Rumberg in Holmdel in 1986. He had two crews at Squire's Runne but was not personally there in 1986 and 1987 because he was remodeling the Rumbergs' home in Spotswood and he let his lead carpenter supervise the framing job. After he completed the Rumbergs' house, he returned to Squire's Runne but could not recall which house he began working on. He claimed to have examined his supervisor's work, done in his absence, and found it to be satisfactory. Ings wanted to do all the framing in Douglas fir but Rumberg refused, as he wanted to use less expensive hem fir. Ings had never before used hem fir on a framing job. He acknowledged that it was he who suggested that certain aspects of the framing deviate from the architectural plans. It was his opinion the homes did not need four-ply beams; and two-by-eights would do just as well as two-by-tens.

Rumberg acknowledged that although he intended to provide the plaintiffs with quality construction, he was unable to do so because of personal problems and because he relied on contractors, as well as a super, who did not do their jobs correctly. Rumberg left many responsibilities to his super, whose previous experience was as a mason, not as a superintendent of construction. Rumberg admitted that his superintendent was so incompetent that he was forced to fire him in the summer of 1987. However, he had been aware of his super's mistakes six to eight months earlier.

Thomas Glick was manager of the East Brunswick Weichert office and dealt directly with Rumberg on both the Holmdel and Squire's Runne development. Richard Albrecht was Weichert's regional vice president. They testified that it was company policy to accept the representations of a builder with respect to his credentials and experience, and no one was responsible for verifying information received from a builder. Further, there was no monitoring of what sales representatives were telling customers. Glick had dealings with Rumberg from Holmdel and knew that his involvement in other developments was only in conjunction with other builders. He also knew that his experience was less than the ten years represented in the article Weichert ran to advertise the development.

[288 *N.J.Super.* at 516–32, 672 A.2d 1190.]

The Law Division concluded that the houses at Squire's Runne were defective and that Weichert was "responsible for the acts of its agents and [was] accountable under the Consumer Fraud Act." In so concluding, the court observed that Ellen Rumberg, Tom Glick, and Ruth Skonieczny knew of the problems at Holmdel. Yet, all three, as well as Nancy Healey, represented that Allen Rumberg built quality homes and was known for his commitment to craftsmanship. In effect, Weichert's agents misled the purchasers to believe that "Rumberg was an exacting and demanding builder of substance." Thus, the Law Division concluded that:

Weichert engaged in the making of material misrepresentations that were relied upon by the several plaintiffs and that these misrepresentations are the proximate

cause of damages sustained by plaintiffs for the structural, functional and appearance defects in their homes at Squire's Runne.

The Appellate Division carefully explained the Law Division's finding that Weichert had made affirmative misrepresentations to the purchasers:

The record supports a finding that misrepresentations to that effect were made to plaintiff Gennari by Nancy Healy [sic], a Weichert agent, who told her that Rumberg was one of the best builders in New Jersey and that he had built hundreds of homes, and was noted for detail and craftsmanship. Healy [sic] described to Gennari, Rumberg's quality control and spoke of his excellent craftsmanship.

Similarly, the Mathews dealt with Weichert agent Ruth Skonieczny who told them that Rumberg had built hundreds of homes, that she had worked with him personally and knew that he was dedicated to quality workmanship, was very experienced, paid a premium for quality craftsmanship and brought the same workers with him from job to job. She described Rumberg as the builder of the development in Mendham.

The Nestors learned of Squire's Runne through newspaper advertisements and a brochure published by Weichert which had only Weichert's name connected with this project. This was followed by a meeting with both Rumbergs, during which Ellen Rumberg, a Weichert representative, asserted that Weichert supported her husband one hundred percent, that his customers loved him and still called him.

The LaChapelles also learned of the project from newspaper advertisements of Weichert listings. They purchased after meeting with Ellen Rumberg who promoted her husband's high quality of workmanship, that he had been in business for over ten years, and his having built over a hundred homes in developments in Holmdel, Mendham and Livingston.

. . . .

Weichert agents' affirmative statements of fact as to Rumberg's reputation, experience, and qualifications were untrue. Testimony from both Rumberg and Rumberg's brother-in-law, Philip Kayne, entirely refuted these representations, as the judge explicitly found in his opinion. The judge found that Rumberg was not even an adequate builder. His work was acceptable when supervised and controlled by a real builder such as his brother-in-law, but when on his own, he demonstrated a gross lack of ability evidenced first by the difficulties in the Holmdel project, followed by greater difficulties in the Squire's Runne development.

The record amply demonstrates that although Rumberg had been employed by Kayne since 1978, he had little responsibility for construction until 1981, with the commencement of the development known as Barnside at Mendham. At that time, he was an overseer, supervised by Kayne, the actual builder. At Holmdel, a small project by a corporation founded by Rumberg and Kayne, Kayne also supervised the work. The only building Rumberg did on his own was the failed Squire's Runne development.

The trial judge found that when Rumberg began Squire's Runne, for the most part his crews and his subcontractors were people with whom he had never previously dealt. His superintendent was not experienced as a supervisor. He was a mason Rumberg had used at Holmdel where there had been problems with wet basements for which he was responsible. The siding subcontractor had simply driven by the site, indicated he could do the work, and he was hired. His framer was not on the job to supervise his crew because he was working on Rumberg's home and the faulty heating and air conditioning systems were installed by non-professionals.

[288 *N.J.Super.* at 539–40, 672 *A.*2d 1190.]

## II.

■ The history of the Act is one of constant expansion of consumer protection. Enacted in 1960, the Act originally vested only the Attorney General with enforcement power against commercial establishments. *L.* 1960 *c.* 39 § 3, *codified at N.J.S.A.* 56:8–3, –5, –8; *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 472–73, 541 *A.*2d 1063 (1988); *Kugler v. Romain,* 58 *N.J.* 522, 537, 279 *A.*2d 640 (1971). Eleven years later, an amendment authorized private actions by injured parties:

Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act or practice declared unlawful under this act ... may bring an action.... In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest.

[*L.*1971 *c.* 247 § 7, *codified at N.J.S.A.* 56:8–19.]

Then, in 1975, the Legislature further amended the Act to include unlawful practices in the sale or advertisement of real estate. *L.*1975, *c.* 294 § 2, *codified at N.J.S.A.* 56:8–2; *Strawn v. Canuso,* 140 *N.J.* 43, 60, 657 *A.*2d 420 (1995) (citing *Arroyo v. Arnold–Baker & Assocs., Inc.,* 206 *N.J.Super.* 294, 297, 502 *A.*2d 106 (Law Div.1985)). Throughout its history, the Act has protected consumers from deception and fraud, even when committed in good faith. *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 16, 647 *A.*2d 454 (1994); *Fenwick v. Kay American Jeep, Inc.,* 72 *N.J.* 372, 376–77, 371 *A.*2d 13 (1977).

■ *N.J.S.A.* 56:8–2 contains the operative language:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

An offense arises under the Act from an affirmative act, an omission, or a violation of an administrative regulation. *Strawn, supra*, 140 *N.J.* at 60, 657 *A.*2d 420; *Cox, supra*, 138 *N.J.* at 19, 647 *A.*2d 454. One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive. *Strawn, supra*, 140 *N.J.* at 60, 657 *A.*2d 420; *Cox, supra*, 138 *N.J.* at 17–18, 647 *A.*2d 454; *Chattin v. Cape May Greene, Inc.*, 124 *N.J.* 520, 522, 591 *A.*2d 943 (1991) (Stein, J., concurring). For liability to attach to an omission or failure to disclose, however, the plaintiff must show that the defendant acted with knowledge. *Cox, supra*, 138 *N.J.* at 18, 647 *A.*2d 454; *Chattin v. Cape May Greene, Inc.* 243 *N.J.Super.* 590, 603, 581 *A.*2d 91 (App.Div.1990), *aff'd o.b.*, 124 *N.J.* 520, 591 *A.*2d 943 (1991).

An intent to deceive is not a prerequisite to the imposition of liability. *Strawn, supra*, 140 *N.J.* at 60, 657 *A.*2d 420; *Cox, supra*, 138 *N.J.* at 17–18, 647 *A.*2d 454; *Chattin, supra*, 124 *N.J.* at 522, 591 *A.*2d 943 (Stein, J., concurring); *Fenwick, supra*, 72 *N.J.* at 377, 371 *A.*2d 13. That rule comports with the rule elsewhere. *See Stephenson v. Capano Dev. Inc.*, 462 *A.*2d 1069, 1074 (Del. 1983) (stating "the defendant need not have intended to misrepresent or make a deceptive or untrue statement"); *Nash v. Hoopes*, 332 *A.*2d 411, 413 (Del.Super.Ct.1975) (stating fraudulent intent is not requisite to relief under statute); *Bell v. Kent–Brown Chevrolet Co.*, 1 *Kan.App.*2d 131, 561 *P.*2d 907, 909 (1977) (stating that intent or prior knowledge by supplier is unnecessary; Consumer Protection Act later amended by Legislature to require proof of intent. *L.* 1976 *ch.* 236, § 3, codified at *Kan. Stat. Ann.* § 50–626); 17 *Am.Jur.*2d *Consumer Protection* § 295 (1990) (stating "intent to deceive is not necessary in order to establish a violation

of a state consumer protection statute, absent statutory language to the contrary").

In some other states, the legislatures have amended their consumer fraud legislation to require proof of an intent to deceive or knowledge that a statement was false. For example, the Illinois courts interpreted the Consumer Fraud Act not to require intent for material misrepresentations regardless of knowledge of the statement's falsity. *See Buzzard v. Bolger*, 117 *Ill.App.*3d 887, 73 *Ill.Dec.* 140, 453 *N.E.*2d 1129 (1983); *Duhl v. Nash Realty, Inc.*, 102 *Ill.App.*3d 483, 57 *Ill.Dec.* 904, 429 *N.E.*2d 1267 (1981); *Beard v. Gress*, 90 *Ill.App.*3d 622, 46 *Ill.Dec.* 8, 413 *N.E.*2d 448 (1980). In response, the Illinois Legislature amended the Consumer Fraud Act to hold real estate brokers liable only if "the salesman or broker knows of the false, misleading or deceptive character of such information." *Ill.Rev.Stat.* Ch. 121 1/2, para. 270b(4) (1989).

We are aware that bills are pending in the New Jersey Senate and Assembly that would amend the Act. As amended by the Senate Commerce Committee, Senate Bill No. 1474 would exempt real estate sales persons or brokers from liability for the communication of misrepresentations unless they actually knew, after making reasonable inquiry, that the misrepresentations were false, misleading, or deceptive. The original statement that accompanied Senate Bill No. 1474 provided that the purpose of the bill was to reverse prospectively the holding of the Appellate Division in the present case. *Statement to Senate Bill No. 1474* (Sept. 19, 1996). Although the statement accompanying the amended version of Senate Bill No. 1474 no longer so provides, the Assembly has retained the provision in the statement that accompanies the parallel bill, Assembly Bill No. 2289. *Statement to Assembly Bill No. 2289* (Sept. 16, 1996). In any event, we must decide this case under the Act in its present form, which does not require proof of knowledge that the statement was false.

Weichert made affirmative misrepresentations about the builder's experience and qualifications as well as the quality of his homes. Because of the affirmative nature of the misrepresenta-

tions, we need not resolve the standard that applies when a statement may be construed as a knowing omission or act of concealment. *See, e.g., Chattin, supra,* 124 *N.J.* at 527, 591 *A.*2d 943 (Stein, J., concurring). Hence, the purchasers need not show that Weichert agents knew that the misrepresentations were false or that Weichert intended to deceive them.

■ Weichert's misrepresentations were not idle comments or mere puffery. As the Appellate Division stated: "[n]ot just 'any erroneous statement' will constitute a misrepresentation prohibited by [the Act]. The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." 288 *N.J.Super.* at 535, 672 *A.*2d 1190. Weichert was more than just a listing broker. It controlled the marketing, advertising, and sale of the homes at Squire's Runne. Through its trailer and signs, Weichert maintained a presence on the site. In fact, Weichert's synergistic business arrangement approached a joint venture with the builder.

For most people, the purchase of a house will be the most important investment of a lifetime. The houses at Squire's Runne cost over $300,000. Weichert anticipated profits of $200,000 from the sale of the houses. Its misrepresentations about the builder and the houses were material, false, and made to induce the purchasers to buy at Squire's Runne. We need not probe the outer limits of liability under the Act to hold Weichert accountable for its misrepresentations.

■ Weichert argues that because of purchasers' meetings with the builder and inspections of other "Rumberg" developments, they did not rely on Weichert's representations. At common law, independent investigations could signal a lack of reliance. *DSK Enterprises v. United Jersey Bank,* 189 *N.J.Super.* 242, 459 *A.*2d 1201 (App.Div.), *certif. denied,* 94 *N.J.* 598, 468 *A.*2d 232 (1983). Weichert's liability, however, arises from the Act, which does not require proof of reliance. Weichert is liable for misrepresentations whether "any person has in fact been misled, de-

ceived or damaged thereby." *N.J.S.A.* 56:8–2. Notwithstanding the purchasers' inquiries, the fact remains that Weichert agents misled, deceived, and damaged them.

## III.

The Law Division found that Weichert alone was the proximate cause of plaintiffs' damages. In so finding, the court ignored the fact that absent the builder's construction of the defective houses, Weichert's misrepresentations would not have caused any harm to the purchasers. The Appellate Division, however, recognized that:

> Rumberg's affirmative misrepresentation of his experience and qualifications as a builder were at least a cause of Weichert's misrepresentations, and Rumberg's direct misrepresentations and breach of contract were the direct and proximate cause of the damages suffered by plaintiffs.
>
> [288 *N.J.Super.* at 542, 672 *A.*2d 1190]

The Rumbergs as well as Weichert were a proximate cause of the purchasers' damages. As the Appellate Division explained:

> It was the concurrence of the misrepresentations of both the broker and the builder which caused plaintiffs to enter into contracts with Rumberg's company. More importantly, it was the failure of Rumberg to adequately perform his contract obligations that caused plaintiffs' damages and losses.
>
> [*Id.* at 543, 672 *A.*2d 1190.]

In sum, both Rumbergs contributed to the damages sustained by the purchasers along with Weichert.

The joint liability of the builder and of Weichert require consideration of the apportionment of damages between them. Weichert concedes that it is responsible for satisfaction of all compensatory damages, but contends it should be held liable only for its proportionate share of treble damages. Under the Act, injured parties may recover three times their ascertainable damages. *N.J.S.A.* 56:8–19. The Comparative Negligence Act enables the trier of fact to determine "the extent, in the form of percentage of each party's negligence or fault." *N.J.S.A.* 2A:15–5.2(a)(2). Furthermore, the Comparative Negligence Act encompasses not only negligence, but also strict liability, *Suter v. San*

*Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 164, 406 *A.*2d 140 (1979); intentional torts, *Blazovic v. Andrich*, 124 *N.J.* 90, 106–09, 590 *A.*2d 222 (1991); and wanton conduct, *McCann v. Lester*, 239 *N.J.Super.* 601, 609–10, 571 *A.*2d 1349 (App.Div.1990). Thus, the Comparative Negligence Act extends beyond negligence to other kinds of fault. *Suter, supra*, 81 *N.J.* at 162–63, 406 *A.*2d 140. Compensation should depend not on the description of the action, but on the nature of the injury and the requested remedies. *Pickett v. Lloyd's*, 131 *N.J.* 457, 470, 621 *A.*2d 445 (1993).

The Appellate Division held that Weichert was entitled to indemnification from Allen because he was jointly liable with Weichert. 288 *N.J.Super.* at 543, 672 *A.*2d 1190. Under that holding, the purchasers could recover the excess portion of damages under the Act entirely from Weichert, and Weichert would be remitted to seeking indemnification from the builder. Because the Rumbergs apparently are judgment proof, the effect of the Appellate Division holding is to visit all the treble damages on Weichert. Our reading of the Act and the Comparative Negligence Act leads us to conclude, however, that "parties causing an injury should be liable in proportion to their relative fault." *Blazovic, supra*, 124 *N.J.* at 110, 590 *A.*2d 222. In effect, as we read the two statutes, the Legislature did not intend that a party in the posture of Weichert should bear the full weight of the treble damages.

Accordingly, at the trial on damages, the trial court should determine damages under *N.J.S.A.* 2A:15–5.1, apportioning a percentage of fault to each culpable party. Only if Weichert is more than sixty percent at fault, may plaintiffs recover from it all of the treble damages. *N.J.S.A.* 2A:15–5.3(a). If less than sixty percent at fault, Weichert would be liable only for the percentage of the treble damages that comport with its percentage of fault. *N.J.S.A.* 2A:15–5.3(c).

As indicated, the Appellate Division found that Allen and Ellen were each liable under the Act. Ellen was an officer of Timberline and of R & R Property Development, Inc., the company established to purchase the Lawrence Township property. In addition,

she was the liaison between the builder and Weichert for the marketing and sale of the houses at Squire's Runne. Despite her intimate involvement, as both a builder and a realtor, the Law Division held that Ellen was not liable under the Act for negligence or for common-law fraud.

Our analysis of the Act that leads to the imposition of liability on Allen also leads, however, to the imposition of liability on Ellen. She had one foot squarely placed in each camp. Although a Weichert employee, she was an officer and shareholder of Timberline. In brief, she was integral to the acquisition of the Lawrence Township property and to the marketing and sales of the homes at Squire's Runne. Her knowledge of the falsity of Allen's misrepresentations, although unnecessary for liability under the Act, confirms the case against her.

Like the Appellate Division, moreover, we find both Rumbergs liable for common-law fraud. The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Jewish Ctr. of Sussex County v. Whale*, 86 *N.J.* 619, 624–25, 432 *A.*2d 521 (1981). Allen and Ellen knew that Allen's experience and qualifications were not as they represented. They induced the purchasers to rely on their representations that Allen had many years of experience, finished construction on schedule, and was a craftsman. None of the statements was true. The purchasers, however, relied on those misrepresentations to their detriment.

Because Allen and Ellen are liable for common-law fraud, they are subject to punitive damages. The purpose of punitive damages is to punish a wrongdoer and deter others. To be subject to liability for punitive damages, a defendant's conduct must be willfully and wantonly reckless or malicious. *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 49, 477 *A.*2d

1224 (1984). The Rumbergs' conduct satisfies the requirements. As the Appellate Division found, the "sole purpose for [Allen's and Ellen's] misrepresentations to plaintiffs was to get them into the development, take their money, and make a profit, without regard to the consequence that plaintiffs would have to live in homes built by inexperienced and careless subcontractors." 288 *N.J.Super.* at 552–53, 672 *A.*2d 1190.

Concerning Weichert's liability for common-law fraud, the Law Division found:

> Assuming, *arguendo*, that certain representations attributable to Weichert were, in fact, fraudulent, the credible evidence of record does not, by the standard of clear and convincing evidence, support a finding that Weichert possessed the requisite awareness of the falsity of such statements to trigger a finding of common law fraud.

It also found that the purchasers had not proved that "Weichert acted knowingly and with an intent to deceive the plaintiffs in the course of making representations." The Appellate Division likewise concluded, when rejecting the purchaser's claim for emotional distress, that Weichert had not "acted intentionally to misrepresent the builder's qualifications." 288 *N.J.Super.* at 550, 672 *A.*2d 1190. These findings are inconsistent with a finding that Weichert is liable for common-law fraud.

To the same effect, the Appellate Division explained, when rejecting the purchasers' claims for punitive damages, that it could not "conclude that Weichert's corporate culpability was so wanton and willful as to warrant an award of punitive damage at common law. Such an award would expose Weichert to a multitude of damages well beyond the Act." *Id.* at 552, 672 *A.*2d 1190; *see Lehmann v. Toys'R'Us, Inc.,* 132 *N.J.* 587, 625, 626 *A.*2d 445 (1993) (holding employer liable for punitive damages under Law Against Discrimination "only in the event of actual participation by upper management or willful indifference"). As the Appellate Division recognized, a finding that Weichert is liable in common-law fraud would raise difficult questions concerning the duplication of damages. We leave undisturbed the trial court's finding that Weichert is not liable for common-law fraud.

In their cross-appeal, the purchasers challenge the Appellate Division's failure to consider the trial court's dismissal of their negligence claim against Weichert. The Law Division held that the purchasers' failure to present expert testimony to establish the standard of care in the real estate industry necessitated a dismissal. Somewhat cryptically, the Appellate Division stated that it "need not reach this issue in view of our affirmance of liability under the Act." 288 *N.J.Super.* at 549, 672 *A.*2d 1190. We cannot say that the trial court erred in dismissing the negligence claim against Weichert.

The purchasers also cross-appeal on the denial of non-economic damages under the Act. They seek recovery for "foreseeable consequences including interference with beneficial use and enjoyment of [the] new homes." The Law Division did not address the issue, and the Appellate Division held that non-economic damages were not recoverable under the Act. 288 *N.J.Super.* at 549, 672 *A.*2d 1190. That holding is critical because the sole basis for recovery against Weichert is its violation of the Act.

In *Jones v. Sportelli*, 166 *N.J.Super.* 383, 391–92, 399 *A.*2d 1047 (Law Div.1979), the Law Division held that the treble damages under the Act are limited only to "ascertainable loss of moneys or property." (quoting *N.J.S.A.* 56:8–19). Whether non-economic damages are recoverable under the Act is unclear. The Act states:

> Any person who suffers *any ascertainable loss* of moneys or property, real or personal, as a result of the use or employment by another person [who commits a violation under the Act].... [T]he court shall, in addition to any other appropriate legal or equitable relief, award threefold *damages,* sustained by any person in interest.
>
> [*N.J.S.A.* 56:8–19 (emphasis added).]

One reading of the Act is that a party who suffers any ascertainable loss has standing to sue and can recover three times "any and all damages sustained." The alternative, and we believe more appropriate, interpretation is that "damages" are limited to "ascertainable loss." At common-law an injured party could recover only for the injuries sustained. Absent a clear expression of

legislative intent changing the common law rule, we are reluctant to read the Act to encompass non-economic losses.

The purchasers have not cross-appealed from the Appellate Division's affirmance of the trial court's denial of the purchaser's claim for negligent and intentional infliction of emotional distress. 288 *N.J.Super.* at 550, 672 *A.*2d 1190. Consequently, those issues are not before us. The record, moreover, supports the findings of the lower courts that purchasers have not established a cause of action for the intentional or negligent infliction of emotional distress. 288 *N.J.Super.* at 550, 672 *A.*2d 1190. As the Appellate Division stated, the record did not prove "that Weichert acted intentionally to misrepresent the builder's qualifications and to thereby produce emotional distress in plaintiffs." *Ibid.* Furthermore, "there [was] no evidence plaintiffs suffered emotional distress 'so severe that no reasonable man could be expected to endure it.'" *Ibid.* (quoting *Buckley v. Trenton Saving Fund Soc.,* 111 *N.J.* 355, 366, 544 *A.*2d 857 (1988)). Concerning the claim for the negligent infliction of emotional distress, "there was neither the kind of physical injury nor the resulting severe emotional distress required to recover under that theory." *Ibid.*

To summarize, Weichert is accountable under the Act for all compensatory damages and its proportionate share of treble damages. Weichert is not liable in negligence. Like Weichert, Allen and Ellen Rumberg are liable under the Act for compensatory damages and for their proportionate share of treble damages. In addition, the Rumbergs are liable for common-law fraud, including punitive damages. No defendant is liable under the Act for the purchasers' non-economic loss or for their emotional distress.

As modified, the judgment of the Appellate Division is affirmed.

*For affirmance and modification*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.