25 A.3d 1103

BLANCA GONZALEZ, PLAINTIFF–RESPONDENT, v. WILSHIRE CREDIT CORPORATION AND U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT DATED MARCH 14, 1997 FOR CITYSCAPE HOME EQUITY LOAN TRUST 1997–B, INC., DEFENDANTS–APPELLANTS.

Argued January 18, 2011—Decided August 29, 2011.

558

560

*Kim A. Watterson,* a member of the Commonwealth of Pennsylvania bar, argued the cause for appellants (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Richard P. Haber* and *Anthony J. Risalvato,* of counsel and on the briefs).

*Madeline L. Houston* argued the cause for respondent (*Houston & Totaro,* attorneys).

*Janine N. Matton,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Matton* and *Megan Lewis,* Deputy Attorney General, on the brief).

*Michael R. O'Donnell* submitted a brief on behalf of amicus curiae New Jersey Bankers Association (*Riker Danzig Scherer Hyland & Perretti,* attorneys; *Mr. O'Donnell, Ronald Z. Ahrens,* and *Anthony C. Valenziano,* on the brief).

*Rebecca Schore* submitted a brief on behalf of amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.,* attorney;

*Mr. Miller, Ms. Schore, Margaret Lambe Jurow,* and *David McMillin* on the brief).

Justice ALBIN delivered the opinion of the Court.

Plaintiff Blanca Gonzalez pledged as collateral the home she jointly owned with Monserate Diaz to secure a loan he obtained from Cityscape Mortgage Corporation. Diaz died, and afterwards plaintiff began making the necessary mortgage payments to the then holder of the loan, defendant U.S. Bank Association. When plaintiff fell behind in making timely payments, the bank secured a foreclosure judgment. The defendant servicing agent for the bank withheld executing on the judgment provided that plaintiff fulfilled the terms of successive agreements into which she entered with the agent. The post-judgment agreements recast the terms of the original loan to Diaz, but included—plaintiff asserts—illicit financing charges and miscalculations of monies due. Plaintiff claims that the servicing agent, knowing that plaintiff had no more than a primary school education and could not speak English, bypassed her legal-services attorney in having her execute a second agreement—an agreement that memorialized predatory and fraudulent lending practices.

Plaintiff alleges that the conduct of the defendant bank and the defendant servicing agent violated the Consumer Fraud Act. Defendants argue that a post-judgment settlement agreement involving a non-debtor mortgagor falls outside the purview of the Act.[1] The trial court agreed and granted summary judgment in favor of defendants. The Appellate Division reversed.

We hold that the post-foreclosure-judgment agreements in this case were both in form and substance an extension of credit to

---

[1] The parties, the trial court, and the Appellate Division have referred to the post-judgment agreements in this case as "settlement agreements." The more precise term is "forbearance agreements," which are agreements to refrain "from enforcing a right, obligation, or debt." *See Black's Law Dictionary* 673 (8th ed. 2004). In summarizing the parties' arguments and the courts' opinions, we recite their terminology despite its imprecision.

plaintiff originating from the initial loan. Fraudulent lending practices, even in a post-judgment setting, may be the basis for a Consumer Fraud Act lawsuit. For that reason, we affirm the Appellate Division.

## I.

### A.

In 1994, plaintiff Blanca Gonzalez and Monserate Diaz purchased a home in Perth Amboy as tenants in common;[2] both of their names were placed on the deed.[3] In February 1997, Diaz borrowed $72,000 from Cityscape Mortgage Corporation (Cityscape) and executed a Fixed Rate Balloon Note with an annual interest rate of 11.250 percent. In the note, Diaz agreed to make monthly payments of $699.31 until the loan's maturity date, March 3, 2012, when a final balloon payment of $61,384.17 would be due. Plaintiff did not sign the note. As security for the loan, plaintiff and Diaz pledged both of their interests in the property by executing a mortgage in favor of Cityscape. The mortgage agree-

---

[2] "A tenancy in common is the holding of an estate by different persons, with a unity of possession and the right of each to occupy the whole in common with the [other]. The interest of a tenant in common may, absent some contractual undertaking, be transferred without the consent of the [other cotenant]." *Capital Fin. Co. of Del. Valley, Inc. v. Asterbadi*, 389 *N.J.Super.* 219, 225, 912 *A.2d* 191 (Ch.Div.2006) (internal citations omitted); *accord Burbach v. Sussex Cnty. Mun. Utils. Auth.*, 318 *N.J.Super.* 228, 233–34, 723 *A.2d* 137 (App.Div.1999); *Black's Law Dictionary* 1506 (8th ed. 2004). The death of one tenant does not give a legal right to the whole of the property to the surviving tenant. *See Weiss v. Cedar Park Cemetery*, 240 *N.J.Super.* 86, 97, 572 *A.2d* 662 (App.Div.1990).

[3] We present plaintiff's best case in this statement of facts. We do so because defendants succeeded on their motion to dismiss plaintiff's complaint on summary judgment, and therefore we "must view the facts in the light most favorable to the non-moving party"—plaintiff. *See Bauer v. Nesbitt*, 198 *N.J.* 601, 604–05 n. 1, 969 *A.2d* 1122 (2009); *R.* 4:46–2(c) (stating that party's motion for summary judgment should be granted when "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law"). A number of the "facts" presented here are disputed by defendants.

ment prepared by Cityscape listed plaintiff and Diaz as "borrower[s]." Although plaintiff was not personally liable on the note signed by Diaz, in the event of nonpayment of the loan, plaintiff's ownership interest in the home was subject to foreclosure to pay Diaz's debt.

In March 1997, Cityscape assigned the note and mortgage to U.S. Bank National Association (U.S. Bank). U.S. Bank acquired the note and mortgage in this case, along with a bundle of other like instruments, in the bank's capacity as trustee, under a pooling and servicing agreement for Cityscape Home Equity Loan Trust 1997–B, Inc. Wilshire Credit Corporation (Wilshire) was U.S. Bank's servicing agent.[4] The role of a servicing agent generally is to collect payments on the loan and, in the event of default, pursue foreclosure or other alternatives to secure payment of the loan. *See* Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, 28 *Yale J. on Reg.* 1, 15, 23, 25–28 (2011).

In 1999, Diaz died intestate.[5] Plaintiff continued to live in the home and make payments on the loan. In 2001, plaintiff was laid off from her factory job at Mayfair Company, where she had been employed for seventeen years. After the layoff, she suffered a heart attack and other health difficulties, and in 2003 was approved for Social Security disability benefits.

Over time, plaintiff fell behind on the loan payments. At some point, Wilshire refused to accept further payments from plaintiff.

---

[4] At all times material to plaintiff's complaint, Wilshire was a wholly owned subsidiary of Merrill Lynch Mortgage Capital, Inc., which in turn was a wholly owned subsidiary of Merrill Lynch & Co., Inc. During the pendency of this case, on January 1, 2009, Bank of America Corporation acquired Merrill Lynch & Co., Inc. and its subsidiaries, including Wilshire. As part of that acquisition, Wilshire's operations have been merged into and assumed by BAC Home Loan Services, LP, an indirectly wholly owned subsidiary of Bank of America and, effective March 3, 2010, BAC Home Loan Services, LP started servicing plaintiff's post-foreclosure-judgment loan that is the subject of this appeal.

[5] The record does not indicate whether anyone has come forward asserting an interest in Diaz's portion of their jointly owned property.

In March 2003, U.S. Bank filed a foreclosure complaint in the Superior Court, Chancery Division, Middlesex County, naming Diaz's estate and plaintiff as defendants. In September 2003, the bank forwarded to plaintiff a Notice of Intent to Foreclose, indicating that $8,108.23 was owed on the loan. Plaintiff was unable to pay the amount due.

In April 2004, the chancery court entered judgment in favor of U.S. Bank in the amount of $80,454.71 plus interest and costs, including $954.55 in attorneys' fees, on the defaulted loan. The court also ordered that the mortgaged premises be sold to satisfy the judgment. A writ of execution was issued, and a sheriff's sale was scheduled for the next month.

Before the sheriff's sale, plaintiff entered into a written agreement with Wilshire, U.S. Bank's servicing agent. In May 2004, Wilshire agreed to forbear pursuing the sheriff's sale contingent on plaintiff paying arrears, including foreclosure fees and costs, of $17,612.84. Plaintiff agreed to make a lump sum payment of $11,000 and then monthly payments of $1,150 through January 20, 2006.[6] Wilshire added the caveat: "THIS TERM MAY NOT REINSTATE THE LOAN." Wilshire further agreed to dismiss the foreclosure action when plaintiff made the account current. The agreement ended with the following language: "THIS IS AN ATTEMPT TO COLLECT A DEBT." In negotiating this agreement with Wilshire, Gail Chester, a lawyer for Central Jersey Legal Services, represented plaintiff.

By the end of September 2005, plaintiff had made payments totaling $24,800 under the agreement—the $11,000 lump sum payment and twelve monthly payments of $1,150. However, plaintiff missed four payments during this period. The trial court calculated, and plaintiff agreed, that she was in arrears $6,461.89

---

[6] After applying the $11,000 lump sum payment, the balance due was $6,612.84. The $1,150 monthly payments consisted of: $699.31, the current monthly payment as it became due; $34.97, a monthly late fee assessed until the account became current; and $415.72, an amount applied to the fixed arrears.

as of October 2005. A sheriff's sale was scheduled but cancelled because the parties entered into a new written agreement in October 2005. Plaintiff was contacted directly; neither Wilshire nor U.S. Bank notified Ms. Chester, the attorney who represented plaintiff on the first agreement.

In negotiating this second agreement, which was entirely in English, Wilshire dealt solely with plaintiff, who did not speak or read English (Spanish is her native language) and who only had a sixth-grade education. Wilshire's own notes indicate that "borrower does not speak English[;] negotiating has been difficult," that plaintiff was disabled and on a fixed income of $600 per month, and that plaintiff did not want to sell the property because it had been in the family for many years.

In this second agreement signed by plaintiff, arrearages, including foreclosure fees and costs, were fixed at $10,858.18.[7] Thus, the arrearages in this agreement were $4,396.29 more than that calculated earlier by the chancery court. Plaintiff agreed to make a lump sum payment of $2,200 and then monthly payments of $1,000 through October 2006. As in the first agreement, Wilshire agreed to discharge the foreclosure action when the mortgage payments became current. This agreement also included the message: "THIS IS AN ATTEMPT TO COLLECT A DEBT."

In September 2006, the attorney for U.S. Bank copied plaintiff on a letter to the sheriff's office stating that the previously scheduled sheriff's sale had been adjourned to October 4, 2006. Yet plaintiff had not missed a single payment required by the 2005 agreement. Indeed, plaintiff had made not only all required payments through October 2006 but also additional payments. Thus, the loan was current, but Wilshire had not dismissed the foreclosure action as promised.

---

[7] Based on plaintiff's review of discovery, a substantial amount of her arrears was attributable to legal fees supposedly incurred by defendants. Plaintiff complains that, because the services for those fees are not adequately described, the legitimacy of the fees cannot be determined.

Plaintiff took the letter from U.S. Bank's attorney to Ms. Chester of Legal Services. Having no knowledge of the second agreement, Ms. Chester wrote to the bank's attorney that plaintiff had paid $20,569.32 in excess of her regular monthly payment, $699.31, since the May 2004 agreement (the first agreement). Ms. Chester suggested that it was time to return plaintiff to the monthly payment schedule of $699.31. The bank's attorney did not respond. Rather, in October 2006, Wilshire sent a letter to plaintiff noting that the second agreement was about to expire and that a new agreement needed to be negotiated otherwise it would resume foreclosure on her property. Ms. Chester contacted the Wilshire Loan Workout Compliance Department seeking answers to the status of plaintiff's obligations. Wilshire then forwarded to Ms. Chester the second agreement. Wilshire could not explain how it had come to the $10,858.18 arrears set in the October 2005 agreement, nor could it explain why plaintiff was not deemed current on the loan.

Additionally, in the period after the chancery court's entry of the foreclosure judgment in April 2004, plaintiff had given Wilshire proof that her residence was covered by homeowner's insurance. Nevertheless, Wilshire required her to purchase additional and unnecessary homeowner's insurance, known as force-placed insurance.[8] The charges for this force-placed insurance—for various non-consecutive periods between December 2004 and September 2009—totaled $3,346.48.

## B.

In July 2007, plaintiff filed a complaint in the Chancery Division, Superior Court, Middlesex County, alleging that defendants Wilshire and U.S. Bank engaged in deceptive and unconscionable

---

[8] Force-placed insurance is insurance procured by a lending institution on collateral pledged by a borrower if the borrower fails to maintain adequate coverage. *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1145–46 (10th Cir.1998). The costs related to the force-placed insurance are added to the borrower's account. *Ibid.*

practices in violation of the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–2. In particular, plaintiff claimed that defendants, knowing that she did not read or speak English and knowing she had previously been represented by an attorney, contacted her directly to negotiate the October 2005 agreement that was written entirely in English. The complaint asserts that Wilshire included in the October 2005 agreement improper costs and fees in calculating her arrearages and demanded amounts that were not due and owing. Plaintiff sought treble damages against Wilshire, attorneys' fees against both defendants, a declaration stating "the correct principal balance on the mortgage loan" and "that the mortgage loan in issue is not in arrears," and an order from the court directing "defendants to take the steps necessary to have the judgment of foreclosure vacated."

After taking some discovery, plaintiff and defendants each moved for summary judgment. The chancery court granted summary judgment in favor of defendants and dismissed plaintiff's CFA complaint. The court held that the CFA does not apply to "post-judgment *settlement agreements* entered into to stave off a foreclosure sale." The court reasoned "that the Legislature never intended the [CFA] to apply to settlement agreements entered into by parties to a lawsuit" and that to read the CFA otherwise "would undermine the settlement of foreclosure actions and potentially the settlement of all lawsuits." The court characterized plaintiff's motives as "transparent—the potential ability to win treble damages and attorneys' fees." The court concluded that the only "appropriate mechanism for [p]laintiff to seek relief is to file a motion to vacate, modify, or enforce the settlement."

### C.

In an opinion authored by Judge Payne, the Appellate Division reversed and reinstated plaintiff's CFA claim. *Gonzalez v. Wilshire Credit Corp.,* 411 *N.J.Super.* 582, 595, 988 *A.*2d 567 (App. Div.2010). The panel viewed the post-judgment agreements between plaintiff and defendants as "unquestionably contracts" cov-

ered by the CFA. *Id.* at 593 & n. 7, 988 *A.*2d 567. The panel rejected the argument that there was no "privity" between plaintiff and Wilshire because the initial loan was executed with Diaz, and further noted that "privity is not a condition precedent to recovery under the CFA." *Id.* at 594 & n. 9, 988 *A.*2d 567. The panel found that plaintiff's "status as a signatory to the [post-judgment] agreements . . . with Wilshire provides her with standing under the CFA." *Id.* at 594, 988 *A.*2d 567.

It viewed plaintiff's CFA claim, in essence, as a charge that Wilshire wrongly transformed "the terms of annually or biannually renegotiated agreements . . . into a never-terminating cash cow." *Id.* at 590, 988 *A.*2d 567. The panel reasoned that, if proven, the monetary damages suffered by plaintiff from Wilshire's alleged unconscionable practices met the "ascertainable loss" requirement under the CFA. *Id.* at 594, 988 *A.*2d 567.

The panel did not hold that most settlements would be subject to the CFA. *Id.* at 593, 988 *A.*2d 567. However, the panel concluded that in this case CFA coverage would be warranted because the post-judgment agreements signed by plaintiff were similar to the cure-and-reinstatement agreements under the Fair Foreclosure Act (FFA), *N.J.S.A.* 2A:50–53 to –68, which permits debtor mortgagors to cure a default at anytime until the order of final judgment.[9] *Gonzalez, supra,* 411 *N.J.Super.* at 589–90, 593, 988 *A.*2d 567. The panel explained that had plaintiff been the initial debtor and the attempts to cure default occurred before entry of the foreclosure order, this state's case law would give

---

[9] Under the Fair Foreclosure Act,

at least thirty days prior to the filing of a complaint in foreclosure, a mortgage debtor must be given a written notice, among other things, of the intent to foreclose, stating the obligation or real estate security interest; the nature of the default claimed; the right of the debtor to cure the default; the sum of money and interest required to cure the default; the date by which the default must be cured to avoid institution of foreclosure proceedings; and the right to cure after foreclosure proceedings have been commenced. [*Gonzalez, supra,* 411 *N.J.Super.* at 589, 988 *A.*2d 567 (citing *N.J.S.A.* 2A:50–56).]

CFA protection to the agreements. *Id.* at 593, 988 *A.*2d 567. The panel found "no principled reason to distinguish" the transactions of a non-debtor mortgagor completed after judgment. *Id.* at 593–94, 988 *A.*2d 567.

The panel disagreed with the chancery court that plaintiff's only recourse to Wilshire's allegedly wrongful conduct was to move for a modification of the "settlement" with Wilshire. *Id.* at 594–95, 988 *A.*2d 567. The panel maintained that the CFA's remedies were created to address the circumstances that allegedly occurred here. *Id.* at 595, 988 *A.*2d 567. The purpose of the treble-damages provision was intended to punish those who engage in unconscionable consumer practices and the purpose of the counsel-fee provision was to allow the victim " 'to attract competent counsel.' " *Ibid.* (quoting *Wanetick v. Gateway Mitsubishi*, 163 *N.J.* 484, 490, 750 *A.*2d 79 (2000)). The panel concluded that plaintiff could withstand Wilshire's motion for summary judgment and that the trial court improperly determined that the CFA was inapplicable to plaintiff's claim. *Ibid.*

We granted defendants' petition for certification. *Gonzalez v. Wilshire Credit Corp.*, 202 *N.J.* 347, 997 *A.*2d 231 (2010). We also granted the motions of the New Jersey Attorney General, the New Jersey Bankers Association, and Legal Services of New Jersey to participate as amici curiae.

## II.

Defendants contend that that the Appellate Division erred because "a judgment creditor's agreement to forbear from conducting a sheriff's sale in exchange for payments" and the servicing of a "mortgage loan" are not covered transactions under the CFA. Generally, they argue that allowing a non-debtor mortgagor who enters into post-foreclosure-judgment settlement agreements to pursue a CFA action against a mortgagee/judgment holder and its servicing agent "will significantly limit the willingness of lenders to workout loans in foreclosure." Defendants point out that plaintiff is not protected by the FFA because she was not required

"to pay the obligation secured by the residential mortgage," (quoting *N.J.S.A.* 2A:50–55), and because "the statutory right to cure and reinstate expires upon the entry of final judgment" (citing *N.J.S.A.* 2A:50–55). Defendants assert that the Appellate Division, without authority, "has essentially granted Diaz's rights under the loan to [plaintiff]." They also posit that the entry of the foreclosure judgment extinguished the initial mortgage and note, and therefore the agreements between plaintiff and defendants were not loan transactions that would trigger the CFA under New Jersey's jurisprudence. According to defendants, ample safeguards are available in the chancery court, and plaintiff "is free to pursue common law claims such as breach of contract and/or fraud," but not a CFA claim.

Amicus New Jersey Bankers Association urges this Court to reverse the Appellate Division for three principal reasons. It claims that the application of the CFA to post-judgment settlement agreements will: 1) undermine New Jersey's "public policy of encouraging the settlement of litigation"; 2) discourage banks and lenders from settling with homeowners in foreclosure actions, thus threatening this State's policy of preserving homeownership; and 3) disrupt foreclosure practices in the chancery courts by allowing settlement agreements to be collaterally attacked by CFA lawsuits. It also maintains that the Legislature expressed its intent to leave "post-foreclosure judgment settlements" unregulated by not applying the "cure and default provisions of the FFA" to such settlements.

Plaintiff counters that unconscionable practices by a lender and its servicing agent in the post-foreclosure-judgment setting—for example, agreeing to accept "installment payments to bring a mortgage current" and then misappropriating those payments—constitute violations of the CFA. According to plaintiff, Wilshire fraudulently converted thousands of dollars of mortgage payments, which should have been applied to interest and principal on the loan, to pay for "force placed insurance on a property that was already insured." Plaintiff asserts that whether the FFA applies

to the facts of this case does not control whether the CFA provides specific remedies for the allegedly fraudulent conduct of defendants. Having the right to proceed with a foreclosure sale, but instead choosing to accept tens of thousands of dollars from plaintiff to pay arrears on interest and principal, did not give defendants a license to violate the CFA at plaintiff's expense. Plaintiff insists that agreements between a homeowner and a lender and its servicing agent following foreclosure do not "preclude CFA coverage" merely because she might have other remedies, such as enforcement or modification of the unfair agreements. In particular, plaintiff notes that the CFA's attorneys' fees provision provides plaintiff with a mechanism for securing counsel to combat fraud. By plaintiff's accounting, lenders and servicing agents will continue to work with homeowners even after foreclosure because it is in their financial interests to do so; they just cannot violate the CFA with impunity.

Amicus Attorney General of New Jersey professes that because mortgage loan servicing is "the subsequent performance of the initial extension of credit," it therefore is a protected activity under the CFA. The Attorney General notes that "because most residential mortgages are now securitized," servicing agents, such as Wilshire, manage the loans rather than the originators of those loans. She observes that the role of the servicer is not just to collect mortgage payments, but also to manage defaulted loans, to oversee foreclosure proceedings, and to attempt a restructuring of the loan for the consumer. She also recognizes that "servicers can inflict unwarranted fees" on consumers, such as force-placed insurance, while those consumers have limited ability to contest questionable practices due to the inherent difficulty in "untangling complicated billing and payment histories and identifying improper charges . . . and errors in calculations." She believes that loan servicers rely on these constraints and expect that a refund and apology will be satisfactory when the "rare borrower does undertake the effort and finds overcharges." The Attorney General states that servicing abuses have "exacerbated the foreclosure crisis by making it difficult if not impossible for many delinquent

borrowers to qualify for viable permanent modifications" of their loans. The Attorney General concludes that there is a cognizable claim under the CFA when a servicing agent of a loan charges impermissible fees and the consumer suffers an ascertainable loss.[10]

Amicus Legal Services of New Jersey urges this Court to apply the remedies available under the CFA to address the "well-documented and widespread" abuses in "mortgage collection practices" that are threatening homeownership among the most vulnerable in our society. Legal Services targets the mortgage servicing agent as the newly formed entity capitalizing from predatory lending. Legal Services explains that under the traditional mortgage-loan model, the original lender retained and serviced the loan. That model has given way to a new reality in which a mortgage loan is sold by the originating lender and then "bundled into a pool of loans" that are sold for investment as a "Residential Mortgage Back Security." One such example is Cityscape Home Equity Loan Trust 1997–B, Inc.

A servicing agent is retained to perform various duties on behalf of the trust pursuant to a "Pooling and Servicing" agreement.[11] The servicing agent collects and applies loan payments, manages defaulting loans through foreclosure, and engages in loss mitigation.[12] One way in which the servicing agent receives compensation is through the retention of ancillary fees—late fees, expenses

---

[10] At oral argument, the Attorney General argued that plaintiff had an actionable CFA claim under either a theory that the agreements were generated from the original loan and the collection efforts were "subsequent performance" on the loan, or under a theory that the settlement agreements were entirely new extensions of credit.

[11] (Citing *Robo–Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Before the House Financial Services Committee Subcommittee on Housing and Community Opportunity*, 111th Cong. 6 (2010) (written testimony of Adam J. Levitin, Associate Professor of Law, Georgetown University Law Center)).

[12] (Citing *ibid.*).

related to the handling of defaulted mortgages, and commissions from force-placed insurance.[13]  According to Legal Services, the servicing agent "actually profits from default" and has a "financial incentive to impose additional fees on consumers." [14]  Within this industry, documented abuses include "the misapplication of payments; charging fees that are fabricated, unwarranted and/or not contracted for; and engaging in coercive collection practices." [15] Because there is little regulation of the servicing agents, Legal Services maintains the consumer-protection remedies of the CFA are a critically important monitoring device.

Legal Services asserts that the repayment agreements at issue here constitute the "subsequent performance of the extension of credit," an activity covered by the CFA. It insists that the foreclosure judgment and agreements do not provide Wilshire with CFA immunity.  Unlike typical settlement agreements, the agreement here "flow[s] from the obligations in the original mortgage," "reflect[s] a forbearance of a right under an existing CFA-covered agreement in which the lender retains all of the rights it already had," and "the same property that secured the original obligation continues to secure the modified payment obligation." Legal Services's central point is that "deterring overreaching in mortgage settlements . . . will enable homeowners to pay their just debts and remain in their homes."

## III.

We must determine whether the manner in which Wilshire secured and executed the post-foreclosure-judgment agreements,

---

[13] (Citing *id.* at 15;  Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, Am. Banker, Nov. 10, 2010, available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (last visited July 28, 2011)).

[14] (Citing *Robo-Signing, supra* note 10, at 15).

[15] (Generally citing Katherine Porter, *Misbehavior and Mistake in Bankruptcy Mortgage Claims*, 87 *Tex. L.Rev.* 121 (2008);  National Consumer Law Center, *Foreclosures: Defenses, Workouts and Mortgage Servicing* (3d ed. 2010)).

as described by plaintiff, constitutes an unconscionable practice prohibited by the CFA. In doing so, we must first define the general purposes and scope of the CFA. Then, we must decide whether plaintiff's post-judgment agreements to pay the loan arrears, which included late fees and force-placed insurance, in expectation of the reinstatement of the loan, and Wilshire's collection efforts, are covered by the CFA.

The Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –195, provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace. *Lee v. Carter–Reed Co.,* 203 *N.J.* 496, 521, 4 *A.*3d 561 (2010). The Attorney General has independent authority to enforce the CFA. *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 14–15, 647 *A.*2d 454 (1994). The CFA is intended to "be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud," *Lemelledo v. Beneficial Mgmt. Corp. of Am.,* 150 *N.J.* 255, 264, 696 *A.*2d 546 (1997), and therefore to be liberally construed in favor of the consumer, *Cox, supra,* 138 *N.J.* at 15, 647 *A.*2d 454. Because the " 'fertility' " of the human mind to invent " 'new schemes of fraud is so great,' " the CFA does not attempt to enumerate every prohibited practice, for to do so would "severely retard[ ] its broad remedial power to root out fraud in its myriad, nefarious manifestations." *Lemelledo, supra,* 150 *N.J.* at 265, 696 *A.*2d 546 (quoting *Kugler v. Romain,* 58 *N.J.* 522, 543 n. 4, 279 *A.*2d 640 (1971)). Thus, to counteract newly devised stratagems undermining the integrity of the marketplace, "[t]he history of the [CFA] [has been] one of constant expansion of consumer protection." *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 604, 691 *A.*2d 350 (1997).

A consumer who can prove "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful conduct and the ascertainable loss,' is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees, *N.J.S.A.* 56:8–19." *Lee, supra,* 203 *N.J.* at 521, 4 *A.*3d 561 (quoting *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 557, 964 *A.*2d 741 (2009)). An unlawful practice under the CFA is the

use or employment by any person of any *unconscionable commercial practice,* deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, *in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance* of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

[*N.J.S.A.* 56:8–2 (emphasis added).]

The term "advertisement" is defined, in pertinent part, as "the attempt . . . to induce directly or indirectly any person *to enter or not enter into any obligation* or acquire any title or interest in any merchandise or to increase the consumption thereof *or to make any loan.*" *N.J.S.A.* 56:8–1(a) (emphasis added). The term "merchandise" includes "goods, commodities, services or anything offered, directly or indirectly to the public for sale." *N.J.S.A.* 56:8–1(c).

The broad language of these provisions encompasses "the offering, sale, or provision of consumer credit." *Lemelledo, supra,* 150 *N.J.* at 265, 696 *A.*2d 546. Indeed, the term "advertisement" includes within its breadth "the attempt . . . to induce . . . any person . . . to make any loan." *N.J.S.A.* 56:8–1(a); *accord Lemelledo, supra,* 150 *N.J.* at 265, 696 *A.*2d 546. The CFA applies to such activities as "lending" and the sale of insurance related to the loan. *Lemelledo, supra,* 150 *N.J.* at 259–60, 265–66, 696 *A.*2d 546 (noting that CFA covers practice of loan packing, defined as "increasing the principal amount of a loan by combining the loan with loan-related services, such as credit insurance, that the borrower does not want"). More particularly, the CFA has been held to apply to the unconscionable terms of a home improvement loan secured by a mortgage on the borrower's home, *Assocs. Home Equity Servs., Inc. v. Troup,* 343 *N.J.Super.* 254, 264–65, 278–80, 778 *A.*2d 529 (App.Div.2001), and to the unconscionable loan-collection activities of an assignee of a retail installment sales contract, *Jefferson Loan Co. v. Session,* 397 *N.J.Super.* 520, 538, 938 *A.*2d 169 (App.Div.2008). Accordingly, collecting or enforcing a loan, whether by the lender or its assignee, constitutes the

"subsequent performance" of a loan, an activity falling within the coverage of the CFA. *Ibid.; accord N.J.S.A.* 56:8–2.

Under the CFA, *"[a]ny person who suffers any ascertainable loss* of moneys or property, real or personal, as a result of the use" of an unconscionable commercial practice may bring a lawsuit seeking, among other things, treble damages. *N.J.S.A.* 56:8–19 (emphasis added). An ascertainable loss includes, for example, a loss incurred through improper loan packing—forcing a borrower to purchase unnecessary insurance. *Cf. Lemelledo, supra,* 150 *N.J.* at 259–60, 266, 696 *A.*2d 546.

### IV.

In determining whether plaintiff has stated an actionable claim under the CFA, we now apply these principles to the facts before us. We begin by reviewing plaintiff's status with Cityscape, the initial lender/mortgagee.

### A.

Cityscape loaned $72,000 to Monserate Diaz with whom plaintiff co-owned a home. Plaintiff and Diaz secured that loan by mortgaging their home to Cityscape. Clearly, Cityscape's loan to Diaz was contingent on plaintiff signing the mortgage papers, which listed both as borrowers. Although in any technical sense plaintiff was not a borrower, she was still in a very real sense indebted to Cityscape. The terms of the mortgage obligated plaintiff to surrender her one-half interest in her home in the event of a default and later foreclosure judgment. Plaintiff may not have been personally obligated to pay the loan, but she would not have had a roof over her head unless she did so. A covered activity under the CFA is an "attempt . . . to induce directly or indirectly any person to enter or not enter into any obligation," *N.J.S.A.* 56:8–1(a) (defining "advertisement"), concerning "anything offered, directly or indirectly to the public for sale," *N.J.S.A.* 56:8–1(c) (defining "merchandise"). As mentioned earlier, the CFA prohib-

its an "unconscionable commercial practice ... in connection with the sale or advertisement of any merchandise or real estate." *N.J.S.A.* 56:8–2. Extending credit and loan packing are covered by the CFA. *Lemelledo, supra,* 150 *N.J.* at 265–66, 696 *A.2d* 546.

We need not address whether Cityscape had a direct relationship with plaintiff, whether called privity or not, that placed plaintiff within the protective ambit of the CFA. *See Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.,* 226 *N.J.Super.* 200, 210–11, 543 *A.2d* 1020 (App.Div.1988) (noting that contractual privity between consumer and seller is not required to bring CFA claim), *aff'd o.b.,* 118 *N.J.* 249, 571 *A.2d* 294 (1990). What is important is that (1) the assignment of the note and mortgage to U.S. Bank (as trustee for Cityscape Home Equity Loan Trust 1997–B) and the appointment of Wilshire as the servicing agent merely substituted those entities for Cityscape in its relationship with plaintiff and that (2) U.S. Bank through its servicing agent, Wilshire, contracted directly with plaintiff in two separate post-foreclosure-judgment agreements. Those agreements clearly establish privity between plaintiff and U.S. Bank and Wilshire.

### B.

The key issue before us is whether the CFA governs extensions of credit after a foreclosure judgment.

After Diaz died in 1999, plaintiff continued to make payments on the loan until hard times came upon her. In 2001, she was laid off from the job she held for seventeen years and sometime afterwards she suffered a heart attack. Given her circumstances, in 2003, she was approved for Social Security disability benefits. That year, U.S. Bank filed a foreclosure complaint, and in 2004 U.S. Bank obtained a judgment in the amount of $80,454.71 plus interest and costs, including $954.55 in attorneys' fees on the defaulted loan. The chancery court ordered that the mortgaged premises—plaintiff's home—be sold to satisfy the judgment.

Unquestionably, U.S. Bank had the right to proceed with a sheriff's sale to satisfy its judgment. Had it done so, plaintiff admittedly would have had no reason to complain. But U.S. Bank and its servicing agent, Wilshire, chose a different path. They decided to give plaintiff the opportunity to reclaim her home conditioned on her satisfying the terms of signed agreements with Wilshire. Plaintiff was required to pay, on a monthly basis, arrearages on the loan, which included built-in foreclosure costs, interest, late fees, counsel fees, and force-placed insurance. For plaintiff, the fulfillment of the agreements held out the prospect of the dismissal of the foreclosure judgment and the probable reinstatement of the loan. In both agreements, defendants stipulated that the foreclosure action would be dismissed when plaintiff became current on the loan.

As a practical matter, both the first and second agreements were nothing more than a recasting of the original loan, allowing Wilshire to recoup for its client, U.S. Bank, past-due payments. As a signatory to the agreement, plaintiff was *obligated* to make the regular monthly payment of $699.31 plus the additional costs already described. Wilshire as the servicing agent was not acting for selfless purposes; it stood to profit through fees it generated by managing the loan. Both agreements stated that Wilshire's purpose was "AN ATTEMPT TO COLLECT A DEBT."

Defendants argue that the post-judgment agreements with plaintiff and Wilshire's collection activities cannot be denominated as the "subsequent performance" of the loan to Diaz, *see N.J.S.A.* 56:8–2, because that loan merged into the final foreclosure judgment, *see Va. Beach Fed. v. Bank of N.Y.*, 299 *N.J.Super.* 181, 188, 690 *A.*2d 1040 (App.Div.1997); *Wash. Mut., FA v. Wroblewski*, 396 *N.J.Super.* 144, 149, 933 *A.*2d 32 (Ch.Div.2007). The cited cases support the general rule that a loan no longer exists after a default leads to the entry of a final judgment. But the doctrine of merger is an equitable principle that requires an examination of all the facts and circumstances, 30A Myron C. Weinstein, *New Jersey Practice, Law of Mortgages* § 31.36 (2d ed.

2000), and "the presumption of merger" can be overcome if it can be shown that the parties had a contrary intent, *Anthony L. Petters Diner, Inc. v. Stellakis*, 202 *N.J.Super.* 11, 18–19, 493 *A.2d* 1261 (App.Div.1985). Moreover, equity cannot be invoked by one with unclean hands to do injustice. *See Borough of Princeton v. Bd. of Chosen Freeholders of Mercer*, 169 *N.J.* 135, 158, 777 *A.2d* 19 (2001). Here, plaintiff counters that the post-judgment agreements treated the initial loan as a continuing debt to be collected, and therefore Wilshire's "subsequent" unconscionable collection practices fall within the scope of the CFA.[16] We need not decide this issue because ultimately we conclude that the post-judgment agreements, standing alone, constitute the extension of credit, or a new loan, and that Wilshire's collection activities may be characterized as "subsequent performance" in connection with the extension of credit. *See N.J.S.A.* 56:8–2 (prohibiting fraud "in connection with" "subsequent performance" of loan).

### C.

The post-judgment agreements between plaintiff and Wilshire were not ordinary settlement agreements; they were forbearance agreements. They retained every characteristic of the initial loan—and more. Plaintiff was still paying off $72,000 in principal that Diaz borrowed at an annual interest rate of 11.250 percent. With both agreements, plaintiff was still making the regular monthly payments of $699.31, along with a host of additional charges: late payment fees, foreclosure costs, attorneys' fees, insurance fees on the subject property, and interest on the arrearages. The May 2004 agreement involved the payment of a lump

---

[16] Plaintiff points out that under New Jersey's Foreclosure Mediation program, as an alternative to the foreclosure of property, modification of a loan through mediation can be requested even after the entry of final judgment, up until the time of the sheriff's sale. Administrative Office of the Courts, *New Jersey Foreclosure Mediation* (2009), *available at* http://www.judiciary.state.nj.us/civil/foreclosure/11290_foreclosure_med_info.pdf. With this example, plaintiff contends that a foreclosure judgment may not extinguish a mortgage loan if the lender forebears from proceeding to a sheriff's sale.

sum of $17,612.84 and monthly payments of $1,150 for two years. The October 2005 agreement involved the payment of a lump sum of $2,200 and then monthly payments of $1,000. Once plaintiff satisfied the arrearages and made the loan current, the agreements called for the dismissal of the foreclosure action and presumably for the reinstatement of the loan according to its original terms.

To consider Wilshire's collection activities concerning these post-foreclosure-judgment agreements as something other than "subsequent performance" in connection with a newly minted loan cannot be squared with either the form or the substance of the agreements. Theoretically, plaintiff could have obtained a loan from a bank to pay off U.S. Bank's judgment under similar terms as set forth in the May 2004 and October 2005 agreements. If Wilshire were the servicing agent on that loan, it could not engage in unconscionable collection practices without offending the CFA. And if that is true, it is hard to countenance an end-run around the CFA by declaring the present agreements to be something other than the "offering, sale, or provision of consumer credit." *See Lemelledo, supra,* 150 *N.J.* at 265, 696 *A.*2d 546.

### D.

We roundly reject defendants' argument that the collection activities of a servicing agent, such as Wilshire, do not amount to the "subsequent performance" of a loan, a covered activity under the CFA. The Attorney General and Legal Services, as amici, both have outlined the abusive collection practices of servicing agents for Residential Mortgage Back Securities. We are in the midst of an unprecedented foreclosure crisis in which thousands of our citizens stand to lose their homes, and in desperation enter into agreements that extend credit—post-judgment—in the hope of retaining homeownership. Defendants would have us declare this seemingly unregulated area as a free-for-all zone, where predatory-lending practices are unchecked and beyond the reach of the CFA. Yet, the drafters of the CFA expected the Act to be flexible

and adaptable enough to combat newly packaged forms of fraud and to be equal to the latest machinations exploiting the vulnerable and unsophisticated consumer. *See Lemelledo, supra,* 150 *N.J.* at 265, 696 *A.*2d 546; *cf. Gennari, supra,* 148 *N.J.* at 604, 691 *A.*2d 350.

The victims of these unsavory practices are most often the poor and the uneducated, and in many circumstances those with little understanding of English, and therefore the "need" for the protections of the CFA is "most acute" in such cases. *See Kugler, supra,* 58 *N.J.* at 544, 279 *A.*2d 640. Accepting as we must the evidence in the light most favorable to plaintiff in the procedural context of this case, Wilshire's alleged exploitation of Blanca Gonzalez placed her on a credit merry-go-round, a never-ending ride driven by hidden and unnecessary fees that would keep her in a constant state of arrearages. Although plaintiff had been represented by a Legal Services attorney during the foreclosure proceedings and the negotiation of the May 2004 post-judgment forbearance agreement, defendants contacted plaintiff directly in September 2005. Plaintiff had missed making several payments after paying off $24,800 under the May 2004 agreement.

Threatening a sheriff's sale of her home, Wilshire inexplicably negotiated a new agreement directly with the unrepresented plaintiff, who could neither read nor speak English, who had only a sixth-grade education, and who was disabled and on a fixed income. The chancery court had calculated plaintiff's arrearages as $6,461.89 as of October 2005, and yet defendants had plaintiff sign an agreement setting the arrearages at $10,858.18. Even though plaintiff had made every payment and was current under that second agreement, defendants nevertheless threatened another sheriff's sale in October 2006. At this time, plaintiff contacted her Legal Services attorney, Ms. Chester, who asked Wilshire to answer a few simple questions. Wilshire could not explain how it had arrived at the $10,858.18 arrearages figure in the October 2005 agreement. It also could not explain how plaintiff's loan was

not current, given that plaintiff had paid $20,569.32 in excess of the regular monthly payments since May 2004.

Within the October 2005 agreement, plaintiff was paying for force-placed insurance that she did not want or need and for defendant's counsel fees that had not been adequately justified. The $3,346.48 paid by plaintiff for force-placed insurance—another form of loan packing—could constitute an "ascertainable loss" under the CFA. *See Lemelledo, supra,* 150 *N.J.* at 259–60, 265–66, 696 *A.2d* 546; Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble,* Am. Banker, Nov. 10, 2010, available at http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (last visited July 28, 2011) (noting that force-placed insurance is often not only unwarranted but also often costs homeowners ten times more than typical insurance policies).

Lending institutions and their servicing agents are not immune from the CFA; they cannot prey on the unsophisticated, those with no bargaining power, those bowed down by a foreclosure judgment and desperate to keep their homes under seemingly any circumstances.

We do not agree with defendants that the only option available to plaintiff in this case was to seek relief from the post-judgment agreements in the chancery court or "to pursue common law claims such as breach of contract and/or fraud." Defendants also argue that a number of federal and state statutes regulate the "mortgage lending and servicing" area, but insist that we declare that the CFA is not an available remedy. That we will not do. The CFA explicitly states that the "rights, remedies and prohibitions" under the Act are "in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." *N.J.S.A.* 56:8–2.13; *accord Lemelledo, supra,* 150 *N.J.* at 268, 696 *A.2d* 546.

Moreover, Legal Services is only capable of representing a fraction of those low-income consumers who are similarly

situated to Blanca Gonzalez,[17] and the Attorney General has limited resources. The CFA was intended to fill that vacuum. One of the important purposes of the CFA's counsel-fees provision is to provide a financial incentive for members of the bar to become " 'private attorneys general.' " *Lemelledo, supra,* 150 *N.J.* at 268, 696 *A.2d* 546 (quotation omitted); *accord N.J.S.A.* 56:8–19. The cumulative-remedies and counsel-fees provisions of the CFA "reflect an apparent legislative intent to enlarge fraud-fighting authority and to delegate that authority among various governmental and nongovernmental entities, each exercising different forms of remedial power." *Lemelledo, supra,* 150 *N.J.* at 269, 696 *A.2d* 546. The poor and powerless benefit from the guiding hand of counsel offered through the CFA.

The equitable and legal remedies available against violators of the CFA, such as the provision for treble damages, reasonable attorneys fees, and costs of suit, *N.J.S.A.* 56:8–19, also serve another important legislative purpose. That purpose "is not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices." *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 12, 860 *A.2d* 435 (2004); *accord Cox, supra,* 138 *N.J.* at 21, 647 *A.2d* 454.

Defendants and amicus New Jersey Bankers Association also argue that application of the CFA to post-judgment-foreclosure agreements and corresponding collection efforts by servicing agents will discourage work-outs by lenders and lead to sheriff's sales, thus in the end diminishing not enhancing the prospect of homeownership. They go even further and posit that applying the CFA to the facts of this case will place in jeopardy all settlement agreements. We do not agree.

---

17 "[T]wo hundred thousand eligible people do seek help from Legal Services each year. Because of inadequate resources, *two-thirds must be turned away.*" Legal Services of New Jersey, *The Civil Justice Gap: An Inaugural Annual Report* 5 (2011), *available at* http://www.lsnj.org/PDFs/The_Civil_Justice_Gap_2011.pdf.

██ The CFA is intended to curtail deceptive and sharp practices that victimize or disadvantage consumers in the marketplace, *see Lee, supra,* 203 *N.J.* at 521, 4 *A.*3d 561; it is not intended to curtail commerce itself. Defendants have made no showing that the CFA, which applies to myriad business activities, has dampened enthusiasm for the profit motive. Those businesses dealing with the public fairly and honestly, eschewing unconscionable practices, have nothing to fear, except the occasional frivolous lawsuit for which there are separate remedies. *See, e.g., N.J.S.A.* 2A:15–59.1(a) (permitting costs and attorneys' fees for frivolous lawsuits). The Legislature already has made the policy decision that the greater good that flows from the remedies available under the CFA outweighs any negligible negative effect that it might have on commerce. Merchants are still selling their wares long after passage of the CFA.

Lenders extend credit to consumers for purchasing automobiles, houses, home improvements, and for numerous other items despite the applicability of the CFA. *See Lemelledo, supra,* 150 *N.J.* at 265, 696 *A.*2d 546; *Troup, supra,* 343 *N.J.Super.* at 278, 778 *A.*2d 529. We are confident that lenders and their servicing agents will continue to negotiate work-outs even in a post-foreclosure-judgment setting when it is in their interest to do so. Lenders want a return on their capital, not to buy and sell homes.

Plaintiff has made allegations and presented evidence that still must survive the crucible of a trial. Plaintiff must prove that defendants acted contrary to the permissible standard of conduct under the CFA. *Cox, supra,* 138 *N.J.* at 18, 647 *A.*2d 454 ("The standard of conduct that the term 'unconscionable' implies is lack of 'good faith, honesty in fact and observance of fair dealing.'" (quoting *Kugler, supra,* 58 *N.J.* at 544, 279 *A.*2d 640)).

This case *in no way* suggests that settlement agreements in general are now subject to the CFA. Here, we are dealing with forbearance agreements. This case addresses only the narrow issue before us: the applicability of the CFA to a post-foreclosure-judgment agreement involving a stand-alone extension of credit.

We hold only that, in fashioning and collecting on such a loan—as with any other loan—a lender or its servicing agent cannot use unconscionable practices in violation of the CFA.

## V.

For these reasons, we affirm the judgment of the Appellate Division vacating the dismissal of plaintiff's complaint. We therefore reinstate plaintiff's cause of action under the CFA and remand for proceedings consistent with this opinion.

*For affirmance and remandment*—CHIEF JUSTICE RABNER, Justices LONG, ALBIN, RIVERA–SOTO and HOENS—5.

*Opposed*—None.

*Not Participating*—Justice LaVECCHIA.